UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRADLEY R. BARGE,
PLAINTIFF

VS.

COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

CASE NO. 1:07CV997
(WEBER, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed his applications for child insurance benefits, disability insurance benefits and supplemental security income benefits in February, 2003. His applications were denied, both initially and upon reconsideration. He then requested and obtained a hearing before an Administrative Law Judge (ALJ) in September, 2005 at Dayton, Ohio. Plaintiff, who was represented by counsel at the hearing, testified as did Vocational Expert (VE) Eric Pruit. The ALJ reached an unfavorable decision in April, 2006. Plaintiff then processed an appeal to the Appeals Council, who denied review in October, 2007. Plaintiff then timely filed his Complaint with this Court seeking judicial review of the final order of the Social Security Administration. The previous grant of benefits terminated when Plaintiff turned 18 years of age.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made 5 errors prejudicial to his case. He categorizes these as follows: (1) the failure to give *res judicata* effect to the prior finding of disability, (2) Listing 12.05(C), (3) the residual functional capacity and the weight to the doctors in the record, (4) the credibility and subjective complaints, and (5) the vocational errors.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he was 6'0" tall, weighed 220 lbs. and was 23 years of age. He testified that he was single and lived alone in a Section 8 apartment in Middletown, Ohio. He graduated from Middletown High School in 2001, but attended special education classes. His last employment was at Wendy's for a 2-3 month period in 2001, although he worked for one day at Swifty's gas station after leaving Wendy's, where he "cleaned up and cooked hamburgers." When asked why he could not work, Plaintiff said that he "was born with a hearing problem" and "had 27 surgeries." He related that he has "a hard time comprehending directions and instructions." He wears no hearing aids and last saw Dr. Goldenberg approximately 5 years ago for a hearing test. He does not drive, but is able to read, cook, wash dishes, clean his apartment, do laundry, shop, make his bed, cut grass, play football and basketball, walk and watch television. He occasionally attends church and goes to movies.

Plaintiff said that he was unable to read lips, that he suffered from frequent ear infections and that Dr. Johnson treated the infections with ear drops.

In response to the VE's question, Plaintiff said that before he worked at Wendy's, he worked at Burger King for approximately 1 year. His employment at Wendy's and Burger King was full time. He was fired from the Burger King job because of "an attitude," apparently caused by not getting a pay raise. (Tr. 285-299).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE 3 hypothetical questions. The first imposed the following restrictions: (1) the job scope should be limited to unskilled and simple repetitive tasks that could be performed by a person with a full scale IQ of 77, (2) the job should involve only oral or verbal instructions, (3) no long-distance communication. The VE responded that Plaintiff could perform his past relevant work as well as multiple jobs at all exertional levels.

The second hypothetical imposed all the limitations of the first and added a restriction that the job must involve no dealing with the public or teamwork. The VE responded that there

would be reductions at all exertional levels, but representative numbers of jobs would remain. Past relevant work would be eliminated.

The third hypothetical, ultimately accepted by the ALJ, imposed all the limitations of the second and added a further restriction that the work environment not be noisy. The VE responded that there would be reductions at all exertional levels, but representative numbers of jobs would remain. The VE was unable to answer counsel's question regarding the number of jobs which would be eliminated by Plaintiff's inability to hear the approach of moving equipment and Plaintiff's disqualification from jobs due to the safety concerns of the employer. (Tr. 298-308).

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has borderline intellectual functioning and a mixed bilateral hearing loss, resulting from a history of inner ear infections and drainage tube placements. The ALJ found that these impairments are severe, but did not meet any Listing, either alone or in combination. The ALJ's residual functional capacity assessment was in accord with his third hypothetical question to the VE. The ALJ found that although Plaintiff could not return to his past relevant work, he could perform a representative number of jobs at all exertional levels and was therefore not disabled as defined by the Social Security Act.

## THE MEDICAL RECORD

Records from the Middletown Public Schools show that Plaintiff attended special education classes and had an IEP (Individualized Education Program), the focus of which was on carpentry. Plaintiff was described as "pleasant, immature" and "lacking motivation" and "with no clear career path." Upon graduation, he was referred to BVR and MRDD, but declined. He was described as having a "mild hearing loss, worse in the right ear." Evaluation by a school psychologist, when Plaintiff was 18 years of age, was as follows: "[o]verall, reading skills were classified as borderline and math skills were found to be poor when compared to typical peers.

3

Brad was able to recognize words and say them orally when compared to his less developed reading for understanding skills. Math reasoning skills were indicated to be better developed than his math calculation skills." Stanford-Binet Intelligence Testing demonstrated "intellectual ability classified as borderline . . . and a percentile rank of 9." Adaptive behavior skills "were overall classified as very low when compared to same-age peers." It was indicated that "Brad is working at the 7th grade level in reading and a late 4th grade level in math." He was determined to be "developmentally handicapped." (Tr. 119-148).

In October, 1986, Plaintiff underwent what is referred to as a "bilateral tympanostomy and ventilation tube insertion," which resulted from a diagnosis of "bilateral serous otitis and recurrent otitis media" at Middletown General Hospital. The surgeon was Eugene Herrmann, M.D. In February, 1988, Dr. Herrmann performed an "adenoidectomny, bilateral tympanotomy and ventillation tube insertion. In September, 1989, February, 1991, October, 1991, March, 1993, April, 1993 and in January, 1994, Dr. Herrmann again performed a "bilateral tympanostomy and ventillation tube insertion." (Tr. 149-168).

When Plaintiff was 12 years of age in January, 1995, Plaintiff saw Kazem Golshan, M.D., whose specialty is head and neck surgery. Dr. Golshan diagnosed Plaintiff with "hypertrophied tonsils, adenoids and serous otitis media." The treatment plan was for a "tonsillectomy, adoidectomy, and bilateral myringotomy with tubes" and the surgery was done. (Tr. 169-174). In June, 1999, Dr. Golshan reported that in October, 1997, when he last saw Plaintiff, he had "tubes in his ears and a conductive hearing loss," later described as "mild." His "speech was normal." (Tr. 175).

In July, 1999. Plaintiff was evaluated by John Heideman, Psy. D., a clinical psychologist. Dr. Heideman reported that Plaintiff had been in LD classes since the 3rd or 4th grade, that his school attendance was "fair" and that he has had multiple ear infections. The Wisc-III showed a full-scale IQ of 67, placing him in the "mildly mentally retarded range," with a verbal IQ of 63 and a performance IQ of 75. His reading, math, spelling , communication, social and personal/behavioral abilities were below the norm. (Tr. 182-186).

Puspa Shah, M.D., a physician employed by the Middletown Social and Health Center, completed a physical residual functional capacity assessment in which he indicated that

4

Plaintiff's ability to stand/walk, sit and lift/carry were not affected by his impairment. Surprisingly, Dr. Shah then found that Plaintiff was "unemployable." (Tr. 188-193).

Plaintiff was evaluated by Stephen Bliss. Psy.D., a clinical psychologist, in May, 2003. Dr. Bliss reported that the Wechsler Adult Intelligence Scale was administered and that Plaintiff's full scale IQ was 77, with a verbal IQ of 81 and a performance IQ of 76. Dr. Bliss categorized Plaintiff as "within the borderline range of intellectual functioning." Dr. Bliss felt that his hearing deficiency and his inability to follow instructions led to frustration and interpersonal conflict. He "showed signs of depression and adjustment difficulties related to current unemployment and financial stressors." Dr. Bliss diagnosed Plaintiff with "Adjustment Disorder with Depressed Mood and concluded that: "[t]aken together, the results of this assessment indicated that Mr. Barge's levels of intellectual and adaptive functioning, as well as his low level of frustration tolerance, will likely make it difficult for him to sustain full-time employment at this time. This is especially true in the fast-paced industry of fast food restaurants, where he has primarily worked in the past." Dr. Bliss found marked limitations of Plaintiff's ability to carry out detailed instructions, maintain attention and concentration, respond appropriately to changes in the work setting and work in coordination with others without being distracted by them. Dr. Bliss found that Plaintiff's ability to set realistic goals or make plans independently of others was extremely limited. (Tr. 194-197).

A mental capacity assessment was done by Joanne Kadle, Ph.D., a clinical psychologist, in June, 2003. Dr. Kadle found no marked limitations, but moderate limitations of Plaintiff's ability to understand, remember and carry out detailed instructions, maintain attention and concentration and sustain an ordinary routine without special supervision. In addition, Dr. Kadle found moderate limitations of Plaintiff's ability to complete a normal workday without interruptions from psychologically-based symptoms, interact appropriately with the general public, accept instructions and criticism from supervisors, get along with co-workers, and maintain socially appropriate behavior. Dr. Kadle also found moderate limitations of Plaintiff's ability to respond appropriately to change and set realistic goals. Dr. Kadle's diagnosis was borderline intellectual functioning and adjustment disorder with depressed mood. (Tr. 198-216)

Robert Goldenberg, M.D., reported in June, 2003 that Plaintiff had a hearing loss, which

5

continued to deteriorate, and chronic ear disease. He has had problems with balance and with being able to keep a job because of difficulty hearing. An examination of Plaintiff's ears showed "[b]oth ears have quite a bit of mucopus present. There is a tube in the right tympanic membrane, but I think it only partially functions because of severe mucosal disease. The mucosa is quite thick in both middle ear spaces. There is a large perforation present in the left tympanic membrane as well. Quite a bit of crusting and debris was present in both external auditory canals." Plaintiff's audiogram showed a "moderately severe mixed hearing loss present bilaterally, which has a very large conductive component. This is about 30 to 40 db." Dr. Goldenberg described Plaintiff's prior surgery by Dr. Golshan as "tympanostomy, tube insertion" and "reconstruction of the tympanic membrane and ossicular chain." (Tr. 217-222).

Both the Defendant and the ALJ as well as Plaintiff's father, make reference to a physical functional capacity assessment by "Nurse Brenda Young," who is referred to as a "nurse practitioner." Although it does appear that the R.N. designation follows the signature of the person referred to a "Brenda Young," the same signature appears at the bottom of a form entitled " Physician Certification of Medical Dependency." So we are at a loss to determine the precise status of Young, but in any event, he or she found, as did Dr. Shah, that Plaintiff's ability to sit, stand/walk and left/carry was not affected by his impairment. There was, however, a marked limitation of Plaintiff's ability to hear. (Tr. 227-229).

A similar assessment was made by Carolyn Fluhart, Ph.D., in January, 2005. Dr. Fluhart found no marked or extremely limited abilities. She found moderate limitations of Plaintiff's ability to understand and remember detailed instructions and to set realistic goals. Dr. Fluhart estimated that Plaintiff's intelligence was average. Although Plaintiff reported a history of LD and ADHD problems, she didn't observe any symptoms of either. Dr. Fluhart felt that Plaintiff had mild difficulty with attention and minimal depression, but was able to work. (Tr. 230-231).

Another assessment was made by Jennifer Stoeckel, Ph.D. in September, 2005. Dr. Stoeckel administered the WAIS-III and obtained a full scale IQ of 63, with a verbal IQ of 67 and a performance IQ of 63. Dr. Stoeckel's opinion was that Plaintiff would be categorized in the "mild mentally retarded range." Her opinion was that "competitive employment would likely be impeded" when Plaintiff's "bilateral hearing loss is superimposed upon his intellectual deficits."

6

(Tr. 232-233).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for

7

disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

8

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by

9

substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Section 405(h) of Title 42 provides that "[t]he findings and decision of the Commissioner after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner shall be reviewed by any person, tribunal, or governmental agency except as herein provided." 42 U.S.C. § 405(h). An initial determination

is binding unless the claimant requests reconsideration or the Commissioner revises its decision. 20 C.F.R. § 404.905. Accordingly, "an initial determination is subject to the doctrine of administrative res judicata." *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 841 (6th Cir. 1997)(citing *Draper v. Sullivan,* 899 F.2d 1127, 1130 (11th Cir.1990)). In certain circumstances, § 405(h) prevents the Commissioner from reconsidering the evidence and reaching conclusion that is contrary to a finding on the same issue in a prior final determination. *Dennard v. Secretary of H.H.S.*, 907 F.2d 598 (6th Cir. 1990); *Lively v. Bowen*, 858 F.2d 177 (4th Cir. 1988); *Gavin v. Heckler*, 811 F.2d 1195 (8th Cir. 1987). For instance, where the Commissioner's prior final determination found that plaintiff could not perform his past relevant work because the work was heavy in nature and he was limited to sedentary work, it is error for the Commissioner to subsequently reevaluate the nature of plaintiff's past relevant work and determine that he is able to perform it because it is light to sedentary work. *Dennard*, 907 F.2d at 599-600.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the

Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff's first Statement of Error is that the doctrine of *res judicata* applies, because the Social Security Administration did not meet its burden to show changed circumstances. Plaintiff was determined to be disabled in 1999, but the determination was made by the Social Security Administration and not an Administrative Law Judge or the Appeals Council. In other words, a hearing was not requested in the prior case because the determination of disability was made on the medical records and agency forms presented by Plaintiff. Defendant argues that this distinction makes all the difference. Plaintiff, of course disagrees. Both parties cite the same case as supportive. That case is *Drummond v. Commissioner of Social Security*, 126, F3d 837 (6th Cir. 1997). We do not read *Drummond* to contain the limitations suggested by the Defendant Commissioner. Although the *res judicata* argument did center around a prior decision by an ALJ that Grace Drummond had the residual functional capacity to perform sedentary work and a later determination by another ALJ that she could perform medium work, we do not read the decision in *Drummond* to authorize a second ALJ to disregard an unappealed and undisturbed finding by the Social Security Administration. The Sixth Circuit, per Judge Nathaniel Jones, held that "an initial determination is binding unless the claimant requests reconsideration or the Commissioner

12

revises its decision. . . . An initial determination is subject to the doctrine of administrative *res judicata*." The Circuit rejected the Commissioner's argument that *res judicata* did not apply because the Social Security Administration was not acting in a judicial capacity and the parties did not litigate the claims. The Circuit's holding was that, "[w]hen the commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by its determination absent changed circumstances." We think this is true, whether or not the final determination by the Social Security Administration is made by agency subordinates, the ALJ or the Appeals Council. The emphasis, in other words, is on the finality of the decision, not who made it. For this reason, we find that *res judicata* applies to initial agency determinations of disability, as well as decisions by the ALJ following administrative hearings.

Unfortunately, the applicability of *res judicata* is immaterial to the present case. The regulations provide for the periodic review of continuing eligibility for Child's SSI benefits.[1] 20 C.F.R. § 416.994a(a). "Once a claimant reaches the age of 18 years of age, his claim becomes subject to a new redetermination under the adult standards for disability, using rules for determining initial eligibility, rather than any medical improvement standard." *Dean v. Astrue*, No. 07-173-GWU, 2008 WL 687212 (E.D.Ky. March 11, 2008); 20 C.F.R. § 416.987 (2002). Thus, regardless of the initial determination of disability for SSI, once Plaintiff reached the age of 18 years, his eligibility for benefits must be evaluated pursuant to the adult standards for disability, and without consideration of the medical improvement standard rules set forth in 20 C.F.R. § 416.994 for disability reviews. (*Id.* at *4); 20 C.F.R. § 416.987(b). Thus, while Plaintiff correctly argues that res judicata applies to his initial determination of disability, such is immaterial to his continuing eligibility.

Plaintiff's Second Statement of Error is that circumstances did not change because he met Listing 12.05(C), which requires significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22). Plaintiff was twenty-one years of age when he filed the current applications for SSI and CDB. (Tr. 56). Plaintiff's previous determination of eligibility is of no use to the present

---

[1] In 1999, at the age of 17 years, Plaintiff was awarded child SSI benefits, which were later terminated when he was awarded child disability benefits (CDB) on the account of his father. (Tr. 65, 72, 87, 259).

13

determination because the prior decision was made pursuant to the children's standards for disability. In light of Plaintiffs age, his eligibility must be determined under the adult standards for disability, using the rules for determining initial eligibility, rather than any medical improvement standard. Thus, Plaintiff's argument with respect to changed circumstances is also misplaced.

In addition to requiring significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22), Listing 12.05 also requires a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function.

In assessing Plaintiff for special education under the Individuals with Disabilities Education Act, the evaluation team reported when Plaintiff was 19 years of age in May, 2001, that Plaintiff had "severe adaptive behavior deficits in the areas of communication, personal living and community living, severe math skills deficits, adequate language, speech, hearing and vision abilities." The team consisted of teachers, counselors, school psychologist, etc. Their observation of adaptive deficits would be credible. Their observations regarding intelligence and degree of hearing loss, however, would be modified by subsequent and earlier intelligence testing, as well as auditory testing and the reports of physicians who treated Plaintiff's ear problems.

In July, 1999, Dr. Heideman administered the WISC-III, an IQ test, when Plaintiff was 16 years of age. He had a verbal IQ score of 63,[2] which placed him in the "mildly mentally retarded range." In May, 2003, Dr. Bliss administered the Wechsler Adult Intelligence Scale because Plaintiff was then 20 years of age. His full scale IQ was 77, classified as "within the borderline of intellectual functioning," however, his performance IQ score was 76. Although all of Plaintiff's IQ scores, full-scale, verbal and performance, were in the 70s, with the exception of a verbal IQ of 81, Dr. Bliss opined that Plaintiff had an adjustment disorder with depressed

---

[2] Pursuant to 20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.00 D, "[i]n cases, where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance and fill-scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."

14

mood and marked deficits in Plaintiff's ability to carry out detailed instructions, maintain attention and concentration, respond to changes and work in coordination with others. His ability to set realistic goals was extremely limited.

In June, 2003, Dr. Kadle supported Dr. Heideman's diagnosis and added borderline intellectual functioning. She found no marked limitations, but generally agreed with the limitations expressed by Dr. Heideman, but not to the degree he stated.

Dr. Fluhart made her assessment in January, 2005, when Plaintiff was 22 years of age. Dr. Fluhart agreed with Dr. Kadle in that she found no marked limitations either, but she also opined that Plaintiff's intelligence was average, an assessment in which nobody concurs and which is obviously erroneous.

Most recently, Dr. Stoeckel administered the WAIS-III on which Plaintiff obtained a full-scale IQ of 63, with both verbal and performance scores in the 60s.

While one out of the three IQ tests administered placed Plaintiff in the "borderline" category, the earliest and most recent tests clearly placed Plaintiff in the "mildly retarded" category. None of the tests were considered invalid and thus, all must be considered valid. Moreover, the test scores cannot be considered in a vacuum. "In assessing the validity of a claimant's I.Q., '[i]nformation from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning, concentration, persistence and pace; or ability to tolerate increased mental demands (stress).'" *Brown v. Secretary of H.H.S.*, 948 F.2d 268, 269 (6th Cir. 1991)(citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 D). While Plaintiff achieved a performance I.Q. score of 76 on his 2003 testing, Dr. Bliss noted that "[t]aken together, the results of this assessment indicated that [Plaintiff's] levels of intellectual and adaptive functioning, as well as his low level of frustration tolerance, will likely make it difficult for him to sustain full-time employment at this time." (Tr. 195). The ALJ chose to credit the 2003 I.Q. test scores over those of the other two tests which placed Plaintiff in the mildly retarded range. However, we find the reasoning upon which the ALJ based his conclusions is flawed. We agree that "artificially elevating" one's I.Q. score is difficult to explain. However, no explanation was sought by the ALJ, namely by a medical expert. Nonetheless, the ALJ chose to credit the 2003 I.Q. scores but discounted the

15

accompanying mental functional capacity assessment as inconsistent with his clinical findings. Rather than considering the two I.Q. tests *in conjunction with* Dr. Bliss' assessment and finding the 2003 scores to be the inconsistent factor, the ALJ chose to credit the one test which supported a finding of non-disability.

The ALJ cited the fact that Plaintiff lived alone, was successful in obtaining Section 8 housing, manages his own finances, and is able to perform all household chores necessary for him to live independently including cooking, washing dishes, sweeping, mopping, vacuuming, doing laundry, and shopping as inconsistent with the adaptive deficits of mild mental retardation. One must be careful in accepting as true what persons with mental and/or intellectual deficits say they can do, because, incredibly, they sometimes lose track of the fact that the requested finding is one of disability, not enhancement of self-worth. So one must investigate a statement by a claimant that he can, for instance, mow the lawn, with qualifiers, such as (1) over what distance? (2) with what type of mower? (3) for how long without breaks? and (4) with what degree of objective success? Plaintiff's father helped him complete Social Security forms and was readily available to testify and might have been able to shed light on the inference made by the ALJ that Plaintiff can manage his own finances, arranged for Section 8 housing and knows how to use a computer and drive a car, all subjects upon which Plaintiff testified, but in a manner which may have been motivated by a desire to avoid embarrassment, as his father says in his supplement to Plaintiff's Statement of Errors. (*See* Doc. 5, Summary, attached).

The DSM-III-R describes mild mental retardation as follows:

> Mild mental retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment of those with the disorder - about 85%. People with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

16

DSM-III-R § 317.00. As the court in *Brown* found, the Commissioner, in promulgating Listing 12.05 C, expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlements to disability benefits. 948 F.2d at 270. So too, Plaintiff's I.Q. scores, with the exception of the 2003 scores, indicate mild mental retardation and his activities of daily living, as well as his education and employment history, fit within the DSM-III-R characterization of a mildly mentally retarded individual.

Drs. Heideman, Bliss and Stoeckel would all qualify as examining, but non-treating psychologists. Two other clinical psychologists have input to contribute. Dr. Kadle, a paper reviewer, estimated that Plaintiff's intellectual capacity would put him in the "borderline" category. She found no marked limitations. Dr. Fluhart, an examining but non-treating source, felt that Plaintiff had average intelligence. She also found no marked limitations. Neither Dr. Heideman or Stoeckel expressed an opinion about Plaintiff's functional deficits, but Dr. Bliss found marked deficits in four areas, the ability to concentrate, follow detailed instructions, respond to changes and work in coordination with others. Dr. Bliss also found that Plaintiff's ability to set realistic goals was extremely limited.

The Listing also requires that deficits in adaptive functioning appear during the developmental period. The records from Middletown public schools make it very clear that this was the case.

In addition, the Listing requires an additional and significant limitation of function and Plaintiff's hearing problem is the obvious deficit to be analyzed here. Middletown High School records are inconsistent with regard to Plaintiff's hearing deficit. One entry states "Brad has a mild hearing loss, worse in the right ear." (Tr. 127). Another states that "[n]o hearing concerns were indicated." (Tr. 144). A third states that Plaintiff has "impaired hearing."

Notwithstanding school records, medical records demonstrated that Plaintiff had ear surgery when he was 4 years of age and suffered from multiple ear infections and the placement of drainage tubes during his developmental years. Dr. Goldenberg described his patient in 2003 as having chronic ear disease and a hearing loss which deteriorated over the years. An audiogram demonstrated a "moderately severe mixed hearing loss." Dr. Golshan described Plaintiff's hearing loss in 1995 as "mild," so we know Plaintiff's hearing loss was progressive

and that fact was confirmed in 2003, by Dr. Shah and by the person we will assume is "Nurse Brenda Young," who determined at some unknown date that Plaintiff's hearing was markedly limited. Thus, there really is no legitimate question at all that Plaintiff had a hearing loss, that it was getting worse and that it is a significant work-related functional deficit. Moreover, the ALJ found Plaintiff's bilateral hearing loss to be a severe impairment for Social Security purposes. (Tr. 27). As such, we find that Plaintiff's hearing loss constitutes the necessary "physical impairment which imposes an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 C.

In conclusion, the Court finds the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for further proceedings consistent with this decision.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

December 22, 2008

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).